[No. 1635, February 5, 1-914.]

THE SOUTH SPRING RANCH & CATTLE CO., et
al., Plaintiffs, v. THE STATE BOARD OF EQUAL-
IZATION OF THE STATE OF NEW MEXICO,
Defendant.

### SYLLABUS (BY THE COURT)

1.   The State Board of Equalization has power to equalize
the valuations of property for taxation purposes by classes,
both as between classes in the same county and as between
counties throughout the state, and the fact that the action
taken results in the increase or decrease of total valuations
in the state is immaterial.

P. 572

### SYLLABUS BY THE PACIFIC REPORTER.

2.   Where a statute empowers a state board to equalize val-

uations for taxation, but does not point out the mode, any reasonable and efficient mode may be adopted to accomplish the end in view.

P. 543.

3. The statute fixing the time and place of a meeting of the State Board of Equalization is notice to the taxpayers that the board will meet and perform only lawful acts and not that it will do illegal things.

P. 567

4. As used in Laws 1913, ch. 84, section 23, providing, that the District Attorney shall, on complaint, submit an assessment to the District Court for correction to avoid injustice to the taxpayer, the word "injustice" is apparently the broadest term that could have been employed in the connection, and applies to any over valuation of the property of a taxpayer.

P. 569

5. So long as the taxpayer is not assessed more than the law provides, and there is no well-defined scheme of discrimination or fraudulent action, he cannot complain on certiorari of an action of the State Board of Equalization.

P. 572

Original petition for certiorari in the Supreme Court by the South Spring Ranch & Cattle Company, a corporation, and others, to review an action of the State Board of Equalization; petition and writ dismissed.

JAMES M. HERVEY, CHARLES A. SPIESS, EDWARD R. WRIGHT and HARRY S. BOWMAN, for plaintiffs.

Validity of the order promulgated by the Board of Equalization of the State of New Mexico for the year 1913. Session Laws 1913, ch. 81, secs. 1, 3, 4, 5, 7; Laws 1913, ch. 84, sec. 12.

What the term "to adjust and equalize the assessment

rolls" means. 37 Cyc. 1076, 1077, 1078; Desty on Taxation, vol. 1, p. 505.

Powers conferred upon the Board of Equalization. Wells Fargo & Co. v. Board of Equalization, 56 Cal. 194; Const. of California, art. XIII, sec. 9; People v. Lothrop, 3 Colo. 428; Const. of California, art. X, sec. 15; People v. Ames, 60 Pac. 346, (Colo.); State v. Vaile, 26 S. W. 672; State v. Thomas, 50 Pac. 615; C. L. 1897, (N. M.) sec. 4048; Lead Co. v. Sims, 18 S. W. 906; Wallace v. State Board of Equalization, 46 Pac. 266, (Mont.); State v. Thomas, (Utah) 50 Pac. 615; M., K. & T. Ry. Co. v. Miami Co. Commrs., 73 Pac. 103; Wallace v. Bullen, 52 Pac. 954, and 54 Pac. 974; Orr v. State Board, 28 Pac. 416; Hacker v. Howe, 101 N. W. 255; Poe v. Howell, (N. M.) 67 Pac. 65; Territory v. First National Bank, 10 N. M. 283; Appeal of McNeal, 128 Pac. 285, (Okla.)

FRANK W. CLANCY, Attorney General; and IRA L. GRIMSHAW, Assistant Attorney General, Santa Fe, N. M., for defendant.

The office of the writ of certiorari is to inquire into and determine only whether the lower tribunal had jurisdiction. Const. of N. M., art. VI, sec. 3; Spelling on Ext. Remedies, sec. 1949; 6 Cyc. 759; In re Lewisohn, 9 N. M. 102; Leyba v. Armijo, 11 N. M. 437.

The Court cannot consider the merits of the order or the case, and cannot examine into the evidence nor matters de hors the record. 2 Spelling on Extr. Rem., sec. 2018; 6 Cyc. 823; 2 Cooley on Taxation, 1400 to 1405; Floyd v. Gilbreath, 27 Ark. 676; 2 Spelling on Extr. Rem., sec. 2022; 49 N. J. L. 169; Shelby County v. Miss. Railroad Co., 1 S. W. 82; In re Henriquez, 5 N. M. 178.

The record returned by defendant is conclusive and cannot be controlled by any matters not appearing therein. 2 Cooley on Taxation, 1410; 6 Cyc. 827; 2 Spelling on Extra. Rem., sec. 2018; Id., pp. 1747, 1751-2; Id., sec. 2010; Id., 1739; People ex rel., etc., v. County Commrs., 27 Colo. 88; Low v. R. R., 18 Ill. 325; Commissioners v.

Darby, 27 Ill. 140; Charleston v. County Commrs., 109 Mass. 270.

The Court cannot inquire into the assessment to determine whether it is excessive or not. 2 Cooley on Taxation, 1405-6; 2 Spelling on Extra. Rem., sec. 1967.

Every lawful intendment is made in favor of the determination and its regularity. 6 Cyc. 532; 2 Spelling on Extra. Rem., p. 1759; Hannible R. R. Co. v. State Board of Equalization, 64 Mo. 297; Taylor v. Louisville Railroad Co., 88 Fed. 350.

The defendant had power and was acting within its statutory rights in making a percentage increase of values for taxation in real property. Const. of N. M., art. VIII, sec. 5, 9; C. L. 1897, sec. 2635; Laws 1907, ch. 103, sec. 1; Laws 1901, ch. 16; C. L. 1897, sec. 2636; Laws 1903, ch. 88, sec. 1; Laws 1909, ch. 124; Laws 1913, ch. 81; Laws 1913, ch. 84.

All laws prior to 1913 were impliedly repealed, because the latter laws made radical changes in the leading parts of the old system. Sutherland Stat. Const., sec. 146; C. L. 1897, sec. 2636; Territory v. Bank of Albuquerque, 10 N. M. 296.

Territorial Board of Equalization had power to adjust and equalize the assessment rolls by raising or lowering the valuation of certain classes of property. Territory v. Bank of Albuquerque, 10 N. M. 296.

Defendant had power by law to make the order of October 1, 1913, in so far as it pertained to personal property. Laws 1913, ch. 84, sec. 13; Territory v. Bank, 10 N. M. 296; Washington County v. St. Louis R. R. Co., 58 Mo. 372-376.

### OPINION OF THE COURT.

PARKER, J.—This is a proceeding by certiorari to review the action of the State Board of Equalization in attempting to equalize the valuation of property for the purposes of taxation. It is admitted by counsel on both sides that the proceeding by certiorari in this jurisdiction is confined within the common-law limits; there being no statute enlarging the scope of the remedy. The question,

then, is whether the Board of Equalization had power or jurisdiction to do what it has done. If the board had the power and jurisdiction to do what was done, it will be assumed in this discussion that the action was correct, at least that it is not subject to review for mere error.

The state board made an order attempting to equalize the valuation of property throughout the State for the purposes of taxation. The order made decreases valuations in every County in the State save one; said decreases aggregating $1,585,590. They made increases in every County in the State; the said increases amounting to $9,233,673. This leaves a net increase of valuation of $7,648,083. The details of said action, in so far as they relate to increases, are best shown by the following table, viz.:

It is ordered by the board that the following raises be made on different classes of taxable property in the various Counties of the State; such percentage or raise being upon the valuation of properties now appearing upon the tax roll as follows:

Ranch & Cattle Co. v. Board of Equalization, 18 N. M. 531.

| County | % | Agricultural Lands Amount | Imps. Amount | % | Grazing Lands Amount | Imps. Amount | % | Timber Lands Amount | % | Coal Lands Amount | % | City and Town Lots Amount | Imps. Amount | % | Carriages & Wagons Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernalillo | 20 | $56,859 | $19,254 | 20 | $44,604 | $1,366 | | | | | 20 | $298,082 | $303,200 | 20 | $4,571 |
| Chaves | 25 | 395,892 | 59,774 | 20 | 74,163 | 33,298 | | | | | 25 | 141,512 | 212,180 | 20 | 4,910 |
| Colfax | 25 | 124,537 | 26,243 | 30 | 293,042 | 45,416 | | | | | 20 | 61,059 | 144,500 | 20 | 3,122 |
| Curry | 20 | 102,042 | 38,616 | | | | | | | | | | | 20 | 2,465 |
| Dona Ana | 0 | | | | | | | | | | | | | 20 | 5,646 |
| Eddy | 10 | 113,234 | 9,542 | | | | | | | | | | | 20 | 2,845 |
| Grant | 0 | | | | | | | | | | | | | 20 | 2,292 |
| Guadalupe | 0 | | | | | | | | | | | | | 20 | 1,286 |
| Lincoln | 20 | 58,285 | 6,670 | 20 | 93,655 | 3,609 | 10 | 4,500 | | | 10 | 22,854 | 22,031 | 20 | 2,092 |
| Luna | 0 | | | 20 | 64,264 | 5,695 | | | | | 10 | 8,821 | 17,482 | 20 | 662 |
| McKinley | 25 | 82,926 | 8,412 | | | | | | | | | | | 20 | 971 |
| Mora | 0 | | | 10 | 62,094 | 12,776 | 10 | 342 | | | | | | 20 | 2,073 |
| Otero | 0 | | | 20 | 83,241 | 47 | 10 | 3,962 | | | 10 | 11,319 | 8,523 | 20 | 1,134 |
| Quay | 20 | 140,774 | 20,391 | 20 | 79,911 | 2,315 | | | | | | | | 20 | 2,664 |
| Rio Arriba | 0 | | | 25 | 174,813 | 6,189 | 20 | 1,082 | | | | | | 20 | 1,928 |
| Roosevelt | 0 | | | | | | | | | | | | | 20 | 1,298 |
| Sandoval | 30 | 204,724 | 15,875 | 20 | 109,666 | 12,987 | 10 | 2,100 | | | | | | 20 | 1,865 |
| San Juan | 30 | 46,201 | 20,281 | 20 | 50,821 | 1,679 | | | | | | | | 20 | 2,215 |
| San Miguel | 0 | | | | | | | | | | 20 | 67,374 | 135,677 | 20 | 2,507 |
| Santa Fe | 0 | | | | | | | | | | 20 | 37,359 | 76,672 | 20 | 3,927 |
| Sierra | 25 | 66,128 | 12,603 | | | | | | | | | | | 20 | 1,297 |
| Socorro | 0 | | | | | | 20 | 884 | | | 10 | 485 | 303 | 20 | 2,628 |
| Taos | 0 | | | | | | | | 20 | 733 | | | | 20 | 1,951 |
| Torrance | 0 | | | | | | | | | | | | | 20 | 1,746 |
| Union | 0 | | | | | | | | | | | | | 20 | 3,075 |
| Valencia | 0 | | | 20 | 147,940 | 1,836 | 10 | 18,931 | | | | | | 20 | 1,669 |
| | | $1,391,604 | $237,663 | | $1,276,104 | $127,213 | | $31,801 | | $733 | | $648,865 | $920,568 | | $62,839 |

Ranch & Cattle Co. v. Board of Equalization, 18 N. M. 531.

| County | Horses & Saddles Amount | % | Merchandise Amount | % | Saloon & Office Fixtures— Amount | % | Watches & Clocks Amount | % | Jewelry Amount | % | Musical Instruments Amount | % | Household Goods Amount | % | Autos Amount | % | Other Property Amount | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernalillo | $1,138 | 20 | $52,638 | 15 | $4,421 | 20 | $703 | 50 | $1,040 | 100 | $3,733 | 50 | $20,966 | 20 | $11,538 | 50 | $35,417 | 50 |
| Chaves | 2,562 | 20 | 87,673 | 15 | 3,112 | 20 | 2,372 | 50 | 9,025 | 100 | 11,067 | 50 | 17,955 | 20 | 24,910 | 50 | 75,085 | 50 |
| Colfax | 1,522 | 20 | 85,243 | 15 | 5,697 | 20 | 911 | 50 | 1,553 | 100 | 6,710 | 50 | 11,621 | 20 | 6,775 | 50 | 1,464 | 50 |
| Curry | 652 | 20 | 18,667 | 15 | 707 | 20 | 1,095 | 50 | 1,963 | 100 | 9,945 | 50 | 6,494 | 20 | | 50 | 37,793 | 50 |
| Dona Ana | 1,229 | 20 | 14,774 | 15 | 1,441 | 20 | 460 | 50 | 1,505 | 100 | 3,457 | 50 | 6,367 | 20 | | 50 | 12,924 | 50 |
| Eddy | 1,232 | 20 | 20,015 | 15 | 4,388 | 20 | 264 | 50 | | 100 | 4,939 | 50 | 7,345 | 20 | | 50 | 28,317 | 50 |
| Grant | 1,000 | 20 | 35,882 | 15 | 4,335 | 20 | 305 | 50 | 437 | 100 | 3,920 | 50 | 8,289 | 20 | | 50 | 20,657 | 50 |
| Guadalupe | 486 | 20 | 10,199 | 15 | 550 | 20 | 263 | 50 | 330 | 100 | 542 | 50 | 2,193 | 20 | | 50 | 5,049 | 50 |
| Lincoln | 354 | 20 | 8,258 | 15 | 414 | 20 | 208 | 50 | | 100 | 786 | 50 | 2,153 | 20 | | 50 | 17,235 | 50 |
| Luna | 168 | 20 | 7,888 | 15 | 898 | 20 | 41 | 50 | | 100 | | 50 | 542 | 20 | | 50 | 7,878 | 50 |
| McKinley | 307 | 20 | 15,323 | 15 | 2,068 | 20 | 460 | 50 | 217 | 100 | 1,871 | 50 | 3,126 | 20 | 1,076 | 50 | 34,074 | 50 |
| Mora | 864 | 20 | 9,620 | 15 | 366 | 20 | 155 | 50 | 813 | 100 | 2,870 | 50 | 2,888 | 20 | | 50 | 23,747 | 50 |
| Otero | 409 | 20 | 6,229 | 15 | 1,007 | 20 | 239 | 50 | 187 | 100 | 648 | 50 | 3,207 | 20 | | 50 | 8,090 | 50 |
| Quay | 827 | 20 | 14,438 | 15 | 2,192 | 20 | 432 | 50 | 248 | 100 | 1,096 | 50 | 2,369 | 20 | | 50 | 2,268 | 50 |
| Rio Arriba | 1,035 | 20 | 9,297 | 15 | 320 | 20 | 84 | 50 | | 100 | 2,729 | 50 | 5,084 | 20 | | 50 | 10,506 | 50 |
| Roosevelt | 352 | 20 | 6,249 | 15 | 962 | 20 | 517 | 50 | 215 | 100 | 574 | 50 | 3,439 | 20 | | 50 | 28,680 | 50 |
| Sandoval | 886 | 20 | 3,430 | 15 | 295 | 20 | 73 | 50 | 40 | 100 | 1,761 | 50 | 1,983 | 20 | | 50 | | 50 |
| San Juan | 755 | 20 | 3,331 | 15 | 1,153 | 20 | | 50 | 309 | 100 | 244 | 50 | 2,000 | 20 | | 50 | | 50 |
| San Miguel | 823 | 20 | 29,515 | 15 | 4,042 | 20 | 463 | 50 | 811 | 100 | 2,431 | 50 | 3,719 | 20 | 5,384 | 50 | 28,554 | 50 |
| Santa Fe | 1,357 | 20 | 16,582 | 15 | 2,095 | 20 | 803 | 50 | 1,782 | 100 | 3,232 | 50 | 7,948 | 20 | 6,678 | 50 | 13,857 | 50 |
| Sierra | 529 | 20 | 6,283 | 15 | 544 | 20 | 113 | 50 | 260 | 100 | 3,302 | 50 | 14,601 | 20 | | 50 | 7,608 | 50 |
| Socorro | 760 | 20 | 15,343 | 15 | 730 | 20 | 425 | 50 | 153 | 100 | 662 | 50 | 1,549 | 20 | | 50 | 713 | 50 |
| Taos | 1,283 | 20 | 7,098 | 15 | 620 | 20 | 376 | 50 | | 100 | 793 | 50 | 4,360 | 20 | | 50 | 1,699 | 50 |
| Torrance | 1,783 | 20 | 8,464 | 15 | 580 | 20 | 245 | 50 | | 100 | 491 | 50 | 2,768 | 20 | | 50 | 23,212 | 50 |
| Union | 1,139 | 20 | 12,053 | 15 | 1,151 | 20 | 123 | 50 | 287 | 100 | 725 | 50 | 2,542 | 20 | | 50 | 90,048 | 50 |
| Valencia | 762 | 20 | 10,561 | 15 | 223 | 20 | | 50 | 195 | 100 | 1,920 | 50 | 3,896 | 20 | | 50 | 13,171 | 50 |
| | $23,214 | | $415,008 | | $42,311 | | $11,219 | | $22,053 | | $70,496 | | $150,776 | | $56,361 | | $528,616 | |

An analysis of this table discloses that the state board raised valuations of property according to classes, and by means of certain percentages in each instance. In the case of about half in number of the different classes of property, the valuations were raised in some counties, and not raised in others. For instance, in the Counties of Dona Ana, Grant, Guadalupe, and Lincoln, no raises were made upon agricultural lands, grazing lands, timber lands, coal lands, and city town lots, while in most of the other Counties the valuation of these classes of property, or some of them, were raised in considerable amounts. The valuation of other classes of property was raised in every County in the State where any of said property had been returned and appeared on the tax rolls. This appears to be the case in regard to carriages and wagons, saddles and harness, merchandise, saloon and office fixtures, watches, clocks, jewelry, musical instruments, household goods, au-tomobiles, and a general class listed as "other property."

These raises of valuation are from 20 to 100 per cent. This evidently presents two fundamental bases upon which the action of the board must have been taken, viz: First, the board raised the valuation of a particular class of property in a given County, or Counties, to the same valu-ation at which it was listed for taxation, in some other given County; second, the board raised the valuation of given classes of property to the same comparative valua-tion of other classes of property, both in the same County and elsewhere throughout the State. This must be taken as the true effect of what the board did. For instance, when they raised the valuation of agricultural lands 20 per cent. in Bernalillo, Chaves, Colfax, Curry, Eddy, Luna, Mora, Roosevelt, San Miguel, Santa Fe, and Taos Coun-ties, and failed to raise the valuation of the same classes of property in the Counties of Dona Ana, Grant, Guada-lupe, Lincoln, McKinley, Otero, Quay, Rio Arriba, San-doval, San Juan, Sierra, Socorro, Torrance, Union, and Valencia, it is to be assumed that said raise in said valua-tion was to equalize the valuation of said class of property in the Counties first named, with its valuation in the other Counties named. But when the board raised the

valuation of carriages and wagons 20 per cent. in every County in the State, it necessarily did so for the purpose of equalizing the valuation of this class of property with the valuation by it put upon agricultural lands, for instance, throughout the State.

We have, then, a case where the board has equalized the valuation of property between classes, and having fixed thereby a comparative standard of valuation, they have attempted to bring up to that same standard all other classes of property in the State. Whether this is exactly the method employed by the board in arriving at this con· clusion does not specifically appear in the return, but, at any rate, this is the necessary consequence of what was done.

This state of affairs would seem to present two questions for discussion, viz: (1) Has the State Board of Equalization power to adjust and equalize the valuation of property by classes for the purposes of taxation? (2) If so, and the action results in increasing the total valuation in Counties or in the State at large, is the action justified?

We do not understand counsel on either side of this case to rely upon any of the provisions of legislation prior to the adoption of the State Constitution, and the passage of two acts at the session of the State Legislature of 1913.

The pertinent constitutional provisions are as follows:

"Section 1. The rate of taxation shall be equal and uniform upon all subjects of taxation."

"Sec. 5. A State Board of Equalization is hereby created which shall consist of the Governor, Traveling Auditor, State Auditor, Secretary of State and Attorney General. Until otherwise provided, said board shall have and exercise all the powers now vested in the Territorial Board of Equalization."

"Sec. 9. All property within the territorial limits of the authority levying the tax, and subject to taxation, shall be taxed therein for State, County, municipal and other purposes: Provided, that the State Board of Equalization shall determine the value of all property of railroad, express, sleeping car, telegraph, telephone and other transportation and transmission companies, used by such

companies in the operation of their railroad, express, sleeping car, telegraph, or telephone lines, or other transportation or transmission lines, and shall certify the value thereof as so determined to the County and municipal taxing authorities." Const., art. 8.

At the session of 1913, the State Legislature passed two acts, which are chapters 81 and 84 of that session. Section 1 of chapter 81 follows the constitutional provision heretofore quoted, and confers power upon the state board to fix values upon transportation and transmission companies, and adds banks and trust companies, and live stock. Section 3 of that act directs the state board to fix the valuation of the property mentioned in section 1, a one-third of the true value thereof, for taxation purposes. Section 4 of that act expressly confers power upon boards of County commissioners to fix values upon all taxable property, except that mentioned in section 1, and is as follows: "The boards of County commissioners of the several Counties shall meet on the second Monday in February of each year and shall proceed in like manner as the State Board of Equalization to ascertain the true value of property of different classes subject to taxation within their respective Counties other than property mentioned in section one hereof, and shall fix a valuation thereof for taxation purposes of thirty-three and one-third per centum of the true value so ascertained." Section 5 of that act directs the assessors of the respective Couties to extend upon the tax rolls the values so fixed by said boards and to list all other property, the valuation of which shall not have been specifically fixed by such County boards, at the same proportionate and uniform valuation as fixed by said boards upon other property. Section 7 of that act confers upon the State board and County boards the same powers and duties of equalization as formerly possessed under the Territorial and State laws.

Chapter 84, passed one day later than chapter 81, is a more comprehensive act than the latter, and deals more in detail with the assessment, levy equalization, and collection of taxes. Section 1 of that act repeals most of the previous legislation under the Territorial government.

Section 2 of the act reiterates the duty of the assessor to fix the valuation for purposes of taxation in accordance with the standards fixed by the County board. Section 12 of that act provides for an appeal from the action of the assessor to the County board, sitting as a board of equalization, and for an appeal from said County board to the State Board of Equalization for the re-examination and revision of the assessment of any taxpayer. Section 13 of the act confers the powers upon the State Board of Equalization, and is as follows: "The State Board of Equalization shall at its said meeting on the first Monday in July examine the assessment roll of each County of the State, for the purpose of ascertaining the rate of assessment and valuation of property therein, and the board shall have the power to adjust and equalize the said assessment rolls so that the valuation of property for purposes of taxation shall be of substantial uniformity throughout the State. Such board at this meeting shall also have power to hear and determine any appeals taken as hereinbefore provided, and any other appeals from the action of any County board, which may be taken by the State, or by any County, or by not less than ten taxpayers of any County, acting through a District Attorney; and in case of any such appeal the appellant must file with the secretary of said board a complete transcript of the appeal case in time for consideration by said board at said meeting in July." Section 14 confers the power on the state board to prescribe the form of assessment books. Section 15 requires the assessors to forward one copy of the completed assessment book or roll to the seat of government for examination by the State board. Section 19 requires the State Auditor, at the conclusion by the State board of its duties as to the revision and correction of the assessment books, and the hearing and determination of appeals, to make the levy of said taxes and to certify the same to the County boards. Section 20 requires the County boards, as soon as practicable after receiving the Auditor's certificate, to make all levies of necessary taxes for the ensuing fiscal year, and to certify the same and the rates thereof to the County Assessor.

Before proceeding to an examination of the specific objections urged by petitioners to the action of the State Board of Equalization, a correct interpretation of our taxing laws will be sought, and in that connection certain fundamental considerations may first be mentioned.

It is to be seen, from the foregoing provisions of the Constitution and statutes, that uniformity throughout the State of the burdens of taxation is to be maintained. In fact, it would be an anomaly in America if discrimination in taxation were to be contemplated in Constitution or statute. This consideration, it seems to us, should be constantly borne in mind in determining the true intent and meaning of the legislation involved.

The second consideration, of equal importance, is the fact that the basis of taxation has been clearly fixed by the statute, viz., the actual value of property. The statute provides that one-third of this actual value shall be taken as the sum upon which the tax of each taxpayer in the State shall be computed. It therefore becomes the duty of each of the three taxing agencies of the State, viz., assessors, board of County commissioners, and the State Board of Equalization, in exercising any of their respective powers, to adhere at all times to this standard of valuation. Any departure therefrom is a violation of the letter and spirit of the taxing laws.

Another consideration, likewise important, is. the fact that the taxing statutes authorize and require the classification ofproperty for the purposes of taxation. The state board is granted the power to prescribe the forms of the tax rolls, which necessarily includes the power to provide that property shall be listed for taxation in such classes as may be prescribed in these forms. The boards of county commissioners are specifically required to meet before the tax lists are actually returned by the taxpayer, and proceed in the same manner as the state board is to proceed, to ascertain the true value of property of different classes subject to taxation, within their respective Counties, and to fix a valuation thereof for taxation purposes. Section 4, c. 81, Laws of 1913. The assessors are required by section 5 of the same act to extend these valuations on the

tax rolls, and to list other property, the value of which has not been so fixed, at the same proportionate valuation. It is therefore clear that the taxation in this State was intended to be by classes of property within Counties, and that valuations for taxation purposes were not otherwise to be ascertained and fixed, at least as to property which by its nature is susceptible of classification.

Another consideration is the fact that the precise manner of the exercise of the power of equalization by the state board is not pointed out in the statute. It is therefore fair to assume the legislative intent to have been to confer upon the board an efficient power of equalization so that the burdens of taxation may be equally distributed throughout the State, and upon all of her citizens. An efficient power of equalization cannot be exercised by the state board unless it has power to deal with classes of property, because the valuations are based upon classification. Justice cannot be done by the state board, by way of equalization, as between citizens of the State, unless it has the power to equalize valuations of classes of property, both of different kinds in the same County and of different classes as between Counties throughout the State. It would seem clear, therefore, that unless the power of the state board is lacking or restrained by reason of the terms of the legislation, considered as a whole, the state board ought to have, and has, the power to deal with classes of property, both within any given County and between Counties throughout the State. To hold otherwise is to defeat the express intent of the taxing laws. If the valuations in Counties can only be increased or decreased as a whole, then the state board has no power to adhere to the fundamental principle of taxation prescribed in the act, namely, that the basis of valuation shall be actual value. If a given class of property in a County is correctly valued, and another given class in the same County is undervalued, and the state board decreases the total valuation in that County, it necessarily departs from the correct standard of valuation as to the first-named class of property. If it increases the valuation of the County as a whole, it necessarily imposes an

unjust burden upon the owners of the class of property which had theretofore been properly valued.

Another consideration is the fact that the power to equalize taxation necessarily includes the power to value property. Taxation consists of three things, viz., assessment, levy, and collection of the tax. Asessment consists of two things, viz., the listing of the property and the valuing of the same for taxation purposes. When the valuations are fixed in the first instance by county boards, on given classes of property, as agricultural or grazing lands, for instance, it is the exercise of one part of the assessing power. When the county board sits as a board of equalization, and fixes values, it is still in the exercise of the same assessing power, and when the state board equalizes the valuation of property throughout the State, either by classes or by Counties, increasing or decreasing the said valuation, this same part of the assessing power is necessarily exercised. It is true that boards of equalization, either County or State, ordinarily have no power to perform one of the powers of assessment, namely, the finding and listing of the property belonging to the individual taxpayer. This part of the power, under our system, devolves upon the assessors or, in some contingencies, upon the collectors. But it is nevertheless true that whenever valuations are fixed by any taxing agency, whether originally or by way of equalization, the other portion of the assessing power is exercised.

In this connection it is to be observed that there is no reference in the taxing laws to the question of increase or decrease of the total valuation in the State, by reason of the action of the state board. Its plain duty is stated to be to equalize the burdens of taxation throughout the State, and whether that action results in increase or decrease of valuations would seem to be entirely immaterial, and to have been so regarded by the legislative department. To hold that the state board has power only to adopt some intermediate standard to which all valuations must be brought, both from above and below it, is to compel the exercise by the Board of Equalization in a manner contrary to the letter and spirit of the taxing laws.

As before stated, the basis of taxation is actual value of property. To bring the valuations of classes of property in any County, or the total value in said County, which has been properly fixed, down to some intermediate line, to which line valuation in other Counties should be raised, would defeat the expressed object of the taxing laws and compel the state board to depart from its plain duty in this regard.

If the preceding statement is fully warranted, as we believe it to be, it becomes unnecessary, perhaps, to discuss another important consideration, viz., the rule of interpretation of taxing laws. If the power to equalize includes, without limitations, the power to assess values, then there is no question concerning the application of the so-called strict or liberal rule of interpretation to our taxing statutes. The power is necessarily included under either rule. But if the power to value property is not necessarily included in the power to equalize valuations, and may or may not be included, according to whether a strict interpretation of the terms used is applied, it then becomes important to determine the true rule of interpretation in such cases.

It is frequently said in the reported cases and by the text-writers that taxes are involuntary contributions, levied by the sovereign upon the citizen for the support of government, and that laws for such purposes, consequently, should be construed strictly in favor of the taxpayer. This is upon the theory that the taxation, in case the tax is not paid, may result in a forfeiture of the citizen's property. It is further often said that the legislature is always at hand to express, in terms requiring no interpretation, its intent as to the extent and manner of exercise of the powers of taxation by the several taxing agencies which may be established by law. In this connection it is further sometimes said that the legislature, having plenary power over the subject, will be deemed to have expressly refrained from granting powers not specifically enumerated. Therefore it is frequently held that no tax shall be laid, and no power shall be exercised, unless the same

is within the express letter, as well as the spirit of the taxing statutes.

As applied to questions as to whether a tax shall be laid on any given class of property or any given occupation of a citizen, there is reason for the rule of strict construction. The legislature has plenary power, and, if it has declined to speak, it is presumed that it is intended that the tax shall not be laid. But no such proposition is involved in this case. The laws being considered are the general tax laws of the State for raising the necessary revenues to support the state government. Every subject of taxation which was dealt with by the state board was clearly within the letter and spirit of the taxing laws. It taxed no property which was not admittedly subject to taxation. Nor is any question of the visiting of penalties upon the taxpayer involved. In such cases there is clearly reason for strict construction. But this case involves the simple question of the administration of the general taxing laws, to the end that the burdens of taxation may be equally distributed among the people. In such case there is no reason for strict interpretation and narrow and technical definitions of terms. In this connection we cannot do better than to quote somewhat at length from Cooley, the great judge and author, as follows:

"The underlying principle of all construction is that the intent of the legislature should be sought in the words employed to express it, and that when found it should be made to govern, not only in all proceedings which are had under the law, but in all judicial controversies which bring those proceedings under review. Beyond the words employed, if the meaning is plain and intelligible, neither officer nor court is to go in search of the legislative intent; but the legislature must be understood to intend what is plainly expressed, and nothing then remains but to give the intent effect. If the words of the law seem to be of doubtful import, it may then, perhaps, become necessary to look beyond them in order to ascertain what was in the legislative mind at the time the law was enacted; what the circumstances were, under which the action was taken; what evil, if any, was meant

to be redressed; what was the leading object of the law; and what the subordinate and relatively unimportant objects." Cooley on Taxation (3rd ed.) 450.

"The question regarding the revenue laws has generally been whether or not they should be construed strictly. To express it in somewhat different language, the ·question is whether, when a question of doubt arises in the application of a statute to its subject-matter or supposed subject-matter, the doubt is not to be solved in favor of the citizen, rather than in favor of the State upon whose legislation the doubt arises, and whether such solution is not most in accord with the general principles applied in other cases. Strict construction is the general rule in the case of statutes which may divest one of his freehold by proceedings not in the ordinary sense judicial, and to which he is only an enforced party. It is thought to be only reasonable to intend that the legislature, in making provision for such proceedings, would take unusual care to make use of terms which would plainly express its meaning, in order that ministerial officers might not be left in doubt in the exercise of unusual powers, and that the citizen might know exactly what were his duties and liabilities. A strict construction in such cases seems reasonable, because presumptively the legislature has given, in plain terms, all the power it has intended should be exercised. It has been very generally supposed that the like strict construction was reasonable in the case of tax laws." Id. 453.

"There may and doubtless should be a distinction taken in the construction of those· provisions of revenue laws which point out the subjects to be taxed, and indicate the time, circumstances, and manner of assessment and collection, and those which impose penalties for obstructions .and evasions. There is no reason for peculiar strictness in construing the former. Neither is there reason for liberality. The difference in some cases is exceedingly important. The one method squeezes everything out of the statute which the unyielding words do not perforce retain; the other reaches out by intendment, and brings the statute whatever can fairly be held embraced· in its

beneficent purpose. The one narrows the statute as it is studied; the other expands it. Every lawyer knows how much easier it is to find a remedy in a statute than an offense. There must surely be a just and safe medium between a view of the revenue laws which treats them as harsh enactments to be circumvented and defeated if possible, and a view under which they acquire an expansive quality in the hands of the court, and may be made to reach out and bring within their grasp, and under the discipline of their severe provisions, subjects and cases which it is only conjectured may have been within their intent. Revenue laws are not to be construed from the standpoint of the taxpayer alone, nor of the government alone. Construction is not to assume either that the taxpayer, who raises the legal question of his liability under the laws, is necessarily seeking to avoid a duty to the State which protects him, nor, on the other hand, that the government, in demanding its dues, is a tyrant, which, while too powerful to be resisted, may justifiably be obstructed and defeated by any subtle device or ingenious sophism whatsoever. There is no legal presumption either that the citizen will, if possible, evade his duties, or, on the other hand, that the government will exact unjustly or beyond its needs. All construction, therefore, which assumes either the one or the other, is likely to be mischievous, and to take one-sided views, not only of the laws, but of personal and official conductt. The government in its tax legislation is not assuming a hostile position towards the citizen, but, as we have elsewhere said, is apportioning, for and as the agent of all, a duty among them; and the citizen, it is to be presumed, will perform that duty when it is clearly made known to him, and when the time of performance has arrived." Id. 460, 461.

"If there should be any leaning in such cases, it would seem that it should be in the direction of the presumption that everything is expressed in the tax laws which was intended to be expressed. The laws are framed by the government for its own needs, and, if imperfections are found to exist, the legislature, in the language of Mr. Dwarris, 'is at hand to explain its own meaning, and to express more

clearly what has been obscurely expressed.' But there can be no propriety in construing such a law either with exceptional strictness amounting to hostility, or with exceptional favor beyond that accorded to other general laws. It is as unreasonable to sound a charge upon it as an enemy to individual and popular rights as it is to seek for sophistical reasons for grasping and holding by its authority every subject of taxation which the dragnet of the official force has brought within its supposed compass. The construction, without bias or prejudice, should seek the real intent of the law; and, if the leaning is to strictness, it is only because it is fairly and justly presumable that the legislature, which was unrestricted in its authority over the subject, has so shaped the law as, without ambiguity or doubt, to bring within it everything it was meant should be embraced." Id. 463. See, also, 37 Cyc. 768.

Judge Cooley cites with approval the case of Cornwall v. Todd, 38 Conn. 443, 447. In that case the question was whether a statute which imposes a personal tax on "persons who are residents" of the taxing districts could be applied to the personalty belonging to the estate of a deceased person. The Court said: "The greatest, and perhaps the only, objection that can be urged against this rule is that we cannot say in strictness that the deceased or his estate is a resident of the district. This objection assumes that the statute is to be strictly construed. But we do not think that the doctrine of strict construction should apply to it. Statutes relating to taxes are not penal statutes, nor are they in derogation of natural rights. Although taxes are regarded by many as burdens, and many look upon them even as money arbitrarily and unjustly extorted from them by government, and hence justify themselves and quiet their consciences in resorting to questionable means for the purpose of avoiding taxation, yet, in point of fact, no money paid returns so good and valuable a consideration as money paid for taxes laid for legitimate purposes. They are just as essential and important as government itself, for without them, in some form, government could not exist. The small pittance we

thus pay is the price we pay for the preservation of all our property, and the protection of all our rights. But there is not only a necessity for taxation, but it is eminently just and equitable that it should be as nearly equal as possible. Hence it is the policy of the law to require all property, except such as is specially exempted, to bear its proportion of the public burdens. Not only so, but the law manifestly contemplates that property rated in the list shall be liable for all taxes, town and school district taxes alike. This is evident from the provision that the district taxes shall be laid on the town list, with special provision for certain changes rendered necessary in order to tax all the real estate situated within the district, and none situated without, and also to assess the tax in each instance upon the right person. In construing statutes relating to taxes, therefore, we ought, where the language will permit, so to construe them as to give effect to the obvious intention and meaning of the legislature, rather than to defeat that intention by a too strict adherence to the letter." Id. 462.

In Singer Mfg. Co. v. Wright, 97 Ga. 114, 121, 25 S. E. 249, 251 (35 L. R. A. 497), the Court, in applying the above rule of construction, says: "While, as a general rule, tax laws must be strictly construed as to their operation upon those to be thereby affected, it will not do, in every instance, to confine words to their literal and ordinary signification."

In Big Black Creek Improvement Co. v. Commonwealth, 94 Pa. 450, it is said: "Statutes are to be construed so as may best effectuate the intention of the makers, which sometimes may be collected from the cause or occasion of passing the statute, and, where discovered, it ought to be followed with judgment and discretion in the construction, though that construction may seem contrary to the letter of the statute." See, also, Chicago Dock Co. v. Garrity, 115 Ill. 155, 3 N. E. 448.

In London & Northwest American Mortg. Co. v. Gibson, 77 Minn. 394, 399, 80 N. W. 207, the question was whether the maxim, "De minimis non curat lex," should be applied to a tax sale which had been had for an amount

slightly over the legal tax, and the Court said: "However, assuming the general rule to be that tax laws must be strictly construed as to their operation upon those thereby affected, we are not disposed to confine in every case the words and phrases of the statute to their literal and ordinary signification. Statutes are to be construed so as best to effectuate the intention of those who made them, and such intent should not be defeated by a too strict adherence to the very letter of the law."

In Salisbury v. Lane, 7 Idaho, 370, 63 Pac. 383, the question was whether the improvements upon unpatented mining claims were exempt under the statutes of that Territory, and the Court said: "We are not in accord with the position taken by counsel for respondent that, in construing statutes in pari materia, we must follow the word, and not the purpose, of the law. All statutes pertaining to revenue are to be construed most strictly in favor of the object of the statute; that is, in favor of the purpose of the statute."

In Aggers v. People, 20 Colo. 348, 38 Pac. 386, the statute provided that property omitted from the tax list might be assessed for back taxes, and the property had not been omitted, but one of the taxes to which it was subject had not been extended and charged upon the property. And the Court said: "The purpose of the statute evidently is to prevent property from escaping taxation through oversight, omission or mistake, and to enable the taxing officers to impose upon all property its just and equal proportion of the public burden. The strict construction contended for by counsel for respondent would prevent the accomplishment of this object and purpose. We think rather that the rule of construction that should be adopted is as stated in Cornwall v. Todd, 38 Conn. 443, quoted with approval by Cooley in his * * * * work or Taxation. * * * "

In State v. Taylor, 35 N. J. Law, 184, 190, without disclosing in the opinion just what was involved in regard to which the statement was made, the report lays down the rule as follows: "A liberal construction must therefore, be given to all tax laws for public purposes, not

only that the officers of the government may not be hin
dered, but also that the rights of all taxpayers may br
equally preserved."

In White v. Walsh, 62 Misc. Rep. 423, 427, 114 N. Y
Supp. 1015, 1017, the statute imposed a tax upon every
"mortgage," and the plaintiff resisted a tax because his
mortgage was in the form of a deed, but was intended as
a mortgage, and the Court says: "The law does not favor
the ingenious scrivener, but looks to the legislative inten
tion as the only guide in interpreting tax laws. The Court
cannot extend the fair meaning of the law so as to in-
clude things not named or described as subjects of taxa-
tion; neither will it permit parties to give new names to
old forms and thus escape the letter of the law."

In Baltimore, C. & A. Ry. Co. v. Com'rs., 93 Md. 113,
123, 48 Atl. 853, 856, the question was as to the powers
of county commissioners as to the levy of taxes upon
property liable to assessment but not assessed, and the
Couort said: "The object to be accomplished by confer-
ring these powers is to give all possible practical effect to
the fundamental principle embodied in our bill of rights
* * * that 'every person in the State, or person holding
property therein, ought to contribute his proportion of
public taxes for the support of the government, according
to his actual worth in real or personal property.' The
reason, therefore, why the power of the county commis-
sioners, in respect to the annual levy of taxes and to the
assessmentof property for taxation in connection there-
with, should not receive a 'strict and severe,' but rather a
'reasonable and liberaal,' construction is quite obvious."

These cases and many others which might be cited, as
well as the text of Judge Cooley, would seem to establish
clearly the proper rule of construction of taxing statutes,
to the effect that a reasonable and fair construction
whereby the intent of the legislature is fully carried out
should be adopted, and that neither a so-called strict con-
struction nor, perhaps, a liberal construction should be
adopoted. As stated by Judge Cooley, it is more properly
a middle ground which should be taken, fair alike to the
citizen and to the State. Under such a rule, the powers

of the State Board of Equalization, to adjust and equalize the burdens of taxation throughout the State, would seem to authorize the definition of those terms as including the power to value property, if, indeed, it is not necessarily included within those terms.

In view of what has been heretofore stated, there would seem to be no difficulty in concluding that the action of the state board is entirely justifiable in so far as it has dealt with classes of property. Its action is presumed to be intended to equalize the burdens of taxation throughout the State, and all of its acts would seem to fall plainly within the terms of its grant of power.

When the state board took the tax rolls of the several Counties for examination, it found them to contain a list of the property of the respective Counties arranged by classification, as provided by law. When it raised the valuation of a given class of property in certain Counties and did not raise the valuation of the same class of property in other Counties, it simply equalized the valuations of that class of property in all the Counties of the State. When the state board raised the valuation of certain classes of property in every County in the State, it simply equalized the valuation of those classes of property with the valuation upon other classes of property throughout the State. In this action the state board was adhering to its plain duty, namely, to value property at one-third of its actual value for taxation purposes. In no instance, so far as appears, did the state board increase the valuation of any class of property in any County beyond one-third of its actual value, or beyond what some one or more classes of property in some one or more Counties had been valued by the County taxing authorities. The question, then, as to whether the state board has power to revise and correct the tax rolls, as they come up from the various Counties, and, as an original proposition, to value all of the property in the State at what it deems to be one-third of its actual value, is not involved in this case. The state board has simply brought up to a standard, which had been fixed by the taxing authorities of some Counties in the State upon some classes of property,

the valuation of all other classes of property in the State. In so doing, it has pursued its power in the only efficient and intelligent manner possible under our law, and has, it is to be presumed, accomplished the purpose for which it was created, namely, to equalize the burdens of taxation upon all of the citizens. While it is alleged in the petition for the writ in this case, that the property of the petitioners had already been fully valued, and had been assessed at one-third thereof for taxation purposes, and that the action of the state board in increasing said valuations resulted in an overvaluation of the property of petitioners, still in this proceeding, as we have before seen, this fact must be deemed not to be established. The state board are necessarily presumed to have acted upon evidence and to have reached a correct result, and their judgment is not open to review.

A construction fair to the taxpayer, and fair to the State, neither unduly strict nor unduly liberal, authorizes the holding that it was the intention of the legislature that the State Board of Equalization should have the power which it has attempted to exercise, at least in so far as it relates to the increase of valuation of classes of property throughout the State. As against this conclusion, counsel for petitioners present the following propositions: (1) The action of the state board is not authorized because it amounts to assessment by increasing the total valuation of property in the State; (2) even if the board has powers of assessment, the power has been illegally exercised in acting upon classes of property. The argument in support of these propositions proceeds upon several grounds. It is first argued that the word "equalization" has a well-defined meaning throughout the country, which has necessarily excluded all asserting power. In support of the argument, several cases are cited.

Poe v. Howell, 67 Pac. 62, is a case decided by Judge D. H. McMillen, on the district bench in Chaves County, in December, 1901. In that case the territorial board had determined that real estate and improvements and stocks of merchandise, in incorporated cities, towns, and villages, and stocks of merchandise outside of such cities,

towns, and villages, had been undervalued throughout the Territory, as compared with the valuations of other classes of property in the Territory, and had ordered the valuations of the same to be increased 10 per cent. in one instance and 15 per cent. in the other. A proceeding was brought by a taxpayer to enjoin the collector from extending on the tax rolls the amounts of these raises. The learned judge held in that case that the action of the territorial board was unauthorized, viz.: First, under the statute then in force, the territorial board dealt with Counties as units only; second, and principally, that the power of equalization necessarily excluded all assessing powers, and therefore the territorial board had no power to increase the total valuations in the Territory, not in terms, but in effect, that some intermediate line must be adopted, to which valuations in Counties must be brought, both from above and below, leaving the total valuations of the Territory the same. The statute under which this decision was rendered is section 2636, C. L. 1897, and contains the following language: "It shall be the duty of the Auditor of the Territory at such meeting to furnish said board with the assessment roll of each County of the Territory for their inspection and examination, for the purpose of ascertaining the rate of assessment and value of property therein, and whenever they are satisfied that the scale of valuation has not been made with reasonable uniformity by the different County Assessors, the said board shall adjust and equalize the said assessment rolls by raising or lowering the valuation thereof, so that the same shall be of a uniform value throughout the Territory."

In comparison with this language, we again quote the language from section 13, c. 84, Laws 1913, as follows: "The State Board of Equalization shall at its said meeting on the first Monday in July, examine the assessment roll of each County of the State, for the purpose of ascertaining the rate of assessment and valuation of property therein, and the board shall have the power to adjust and equalize the said assessment rolls so that the valuation

of property for purposes of taxation shall be of substantial uniformity throughout the State."

It may be argued with some force that, under the language of section 2636, C. L. 1897, the territorial board was required to deal with Counties as units, although this was denied by the Territorial Supreme Court, in Territory v. Bank, 10 N. M. 283, 65 Pac. 172, which will be noticed later. The language of the section mentions the assessment rolls, and provides for the raising or lowering of the valuations thereof. The language of section 13 of chapter 84, Laws of 1913, supra, with which we are concerned, is vastly different. It provides for the equalization of the valuations of property in the State, not assessment rolls.

Judge McMillen's second proposition, that "equalization" has a well-defined meaning throughout the country and necessarily excluded all forms of assessing power, however, is more doubtful.

We have therefore pointed out that to equalize the valuation of one thing, which has been undervalued, with that of another, which has been truly valued, necessarily included a portion of the assessing power. If an increase in total valuations results from the action, it is merely incidental, and, as we have before seen, would seem to be immaterial and to have been so considered by the legislature.

Previously, in August, 1900, the Territorial Supreme Court, in Territory v. Bank, 10 N. M. 283, 65 Pac. 172, had held differently. The Territorial Board of Equalization, under the powers conferred by section 2636, C. L. 1897, raised the valuation of bank stock of a number of banks in the Territory to 60 per cent. of its par value. The Court in that case, in an opinion by Mr. Justice McFie, held that even under section 2636, C. L. 1897, the territorial board had power to equalize the valuation of property by classes, and that no notice of such action was required; the statute itself, by its provision for an annual meeting on a certain day, being a sufficient notice to the taxpayer. The Court also necessarily held that the Territorial Board of Equalization, under said section 2636, C.

L..1897, had power to increase the total valuations in the State, because it appears, from the opinion in that case, that an increase of valuations was made upon the bank stock of a large number of banks in the Territory, and none appear to have been decreased.

In Poe v. Howell, supra, Judge McMillen attempted to distinguish that case from the case of Territory v. Bank, supra, in that in the latter it did not appear that the action of the territorial board resulted in any increase of valuations in the Territory as a whole. In this we think he was in error, because it appears, at least inferentially, from the statement of the facts in the case, that the action taken must have resulted in increase of valuations.

Poe v. Howell was never appealed to the Supreme Court of the Territory. Territory v. Bank, 10 N. M. 283, 65 Pac. 172, was cited and approved in Bank v. Albright, 13 N. M. 514, 86 Pac. 548. This case was affirmed by the Supreme Court of the United States. See 208 U. S. 548, 28 Sup. Ct. 349, 52 L. Ed. 614. Bank v. Perea, 5 N. M. 664, 25 Pac. 776, was affirmed in 147 U. S. 87, 13 Sup. Ct. 194, 37 L. Ed. 91. Neither of these cases are pertinent to this part of the discussion. These are all of the decisions in this jurisdiction.

The holding in Territory v. Bank, 10 N. M. 283, 65 Pac. 172, is not without support, in principle, by cases in other jurisdictions, under similar statutes.

In Chamberlain v. Walter (C. C.) 60 Fed. 788, the question was not the same as here; it being a question as to when courts may relieve against discrimination in taxation. But in that case railroad property had been raised several thousand dollars per mile; which valuation was all, or more than, the actual value of the property, while all other property in the State was valued for taxation at from 50 to 60 per cent. of its value. The state board had power there to equalize by raising the valuation of railroad property which was undervalued, and by decreasing such as was overvalued, but there was no aggregate value to be maintained, so far as the requirements of the statute were concerned. The Court held that, as there was no aggregate to be maintained, to equalize was to se-

cure equality, and the increase in total valuations result-
ing from the action of the board was ignored.

In Appeal of McNeal, 35 Okla. 17, 128 Pac. 285, there
is a review of all of the Oklahoma decisions, and it is
chiefly valuable for this reason, because the statute under
which the decision was rendered is different from ours,
in that it expressly authorizes the state board to deal with
classes of property and to equalize all property to con-
form to the fair cash value thereof. The former decis-
ions in Oklahoma were rendered under the following stat-
utory provision: "It shall be the duty of said board to
examine the various County assessments and to equalize
the same, and to decide upon the rate of territorial tax
to be levied for the current year, together with any other
general or special territorial taxes required by law to be
levied, and to equalize the levy of such taxes throughout
the Territory. And shall therefrom find the percentage
that must be added to or deducted from the assessed value
of each County, and shall then order the percentage so
found to be added to or subtracted from the assessed
values of each of the various Counties of the Territory,
and shall notify the various County Clerks of the per-
centage so ordered to be added to or subtracted from the
valuation of property in their respective Counties."

Under this statute it was held in Gray v. Stiles, 6 Okla.
455, 49 Pac. 1083, that the sole power of the state board
was to equalize by increasing the valuation in some of
the Counties and decreasing that of others, the aggregate
amount in the Territory to remain the same as fixed by
the local taxing agencies, except such slight variations as
might necessarily occur in the process of equalization.
Previously, under the same statute, in Wallace v. Bullen,
6 Okl. 17, 52 Pac. 954, it was pointed out that the basis
of taxation was fixed by statute at actual value of
property, and the state board had taken a standard fixed
in one County (Kingfisher) as the true standard, and had
brought all other Counties up to that same standard. The
Court said: "We hold that the statute creating the Ter-
ritorial Board of Equalization conferred upon that board
authority to review and correct the valuations of prop-

Ranch & Cattle Co. v. Board of Equalization, 18 N. M. 531.

erty for taxation returned to them by the County Clerks of the several Counties of the Territory, and to equalize such valuation upon the basis of the true cash value of the property, and that they may lawfully increase the aggregate of valuation of property in the several Counties of the Territory returned by the said several Clerks of the several Counties; that the several acts of said board complained of in the petition in this cause were within the jurisdiction of the said board, and authorized by law." On rehearing of this case (6 Okl. 757, 54 Pac. 974), Gray v. Stiles was expressly overruled, and the former opinion was adhered to; the Court added: "And under the provisions of our statutes relating to the assessment and valuation of property for revenue purposes, and defining the power of the several officers and boards, we hold that the Territorial Board of Equalization, in exercising its powers to equalize the assessments of the various Counties for purposes of taxation, may, from all the returns made from the various Counties, determine which of such returns in the judgment of the board most nearly represents an assessment based upon the true cash value of the property in such County, and may adopt such return as the standard or basis for equalization, and may add to or deduct from all the remaining returns such per cent. as will be required to cause the various other Counties to conform to such standard or basis of assessed valuation, notwithstanding such action may result in increasing or diminishing the aggregate valuation as shown by the returns made by the several County Clerks."

In Bardrick v. Dillon, 7 Okl. 535, 54 Pac. 785, this same doctrine is applied to equalization by county boards. The Court said: "The statute points out no manner in which this power is to be executed and duty performed, and there is no limitation upon the manner in which the equalization shall be done, except that property shall not be valued above its true cash value. Our statute contemplates that all taxable property shall be valued for purposes of taxation at its fair cash value; and all assessing officers and equalizing boards are bound, when performing the duties imposed on them, to keep this fact in view,

and not fix such values or make such additions for purposes of equalization as will increase the property beyond its fair cash value."

These Oklahoma cases are certainly authority for one phase of our holding in the case at bar, viz., that the result of increase or decrease of total valuations is immaterial in defining the power of the equalization under a statute quite similar to ours.

In State v. Nichols, 29 Wash. 159, 69 Pac. 771, the Washington Supreme Court discussed one phase of this same question. They have there express statutory authority to deal with property by classes, but no power is given in terms to increase the total valuations in the State. The same argument against the power to increase total valuations was there made as is made here, but the Court overruled the same, declined to follow the Colorado, Montana, and California cases which were urged upon them, and relied upon the Oklahoma cases, and a case from Utah (State v. Thomas, 16 Utah, 86, 50 Pac. 615.)

In Utah they had a constitutional provision providing for the valuation of property for taxation purposes at its actual value, and for the equalization of values in Counties by county boards and in the State by state boards.

In Salt Lake City v. Armstrong, 15 Utah, 472, 49 Pac. 641, the Utah Supreme Court held that county boards had the power to equalize, notwithstanding such action resulted in the increase of totoal valuations in the County. The argument of the Court was based somewhat on the fact that the mode of equalization was not pointed out in the Constitution, and that therefore the county board might exercise the power in such reasonable and efficient manner as it might determine.

In State v. Thomas, 16 Utah, 86, 50 Pac. 615, the Court went further and held that increase in total valuations in Counties was not objectionable. It applied the same principle to the action of the state boards. It is true that in Utah they had a statute supplementing the constitutional provision, expressly empowering the state board to equalize vaulations to the actual value of prop-

erty, and in this jurisdiction we have no such statute. But it is nevertheless true that here, as heretofore pointed out, and as stated in the Oklahoma cases above quoted, the duty to reach actual value as a basis for taxation is constantly before each taxing agency of the State by the provisions of our statute now being considered.

In Arizona the same question has been considered. There they had no statute specifically authorizing equalization by classes of property, but, like ours, their statute required the listing of property by classes. They had no express statutory authority to increase the total valuations within the Territory nor to equalize valuations to actual value. Their statute, while not in the exact terms of ours, gives the territorial board no more or different powers than is possessed by our state boards. The Arizona Court, in Copper Queen M. Co. v. Territorial Board of Equalization, 9 Ariz. 383, 84 Pac. 511, affirmed 206 U. S. 474, 27 Sup. Ct. 695, 51 L. Ed. 1143, held two things, viz.: First, that increasing the total valuations by equalization was allowable, distinguishing and rather criticising Poe v. Howell, supra; second, that the Board of Equalization had power to equalize by classes of property, citing and approving Territory v. Bank, 10 N. M. 283, 65 Pac. 172, supra, counsel attempting to distinguish the Arizona case by saying that the Arizona statute gave county boards no power to equalize by classes, but limited them to dealing with individuals, while the territorial board was given power to make classification of property. Even so, it still remains true that no specific power to equalize by classes or to increase totals in the Territory was conferred, and the action of the territorial board was justified on the ground that it had exercised its powers in the only fair, reasonable, and efficient manner it could to secure uniformity of tax burdens.

Counsel for petitioners rely principally upon the Colorado, Montana, and California cases, aside from Poe v. Howell, supra. The leading case in Colorado, and a much cited case elsewhere, is People v .Lothrop, 3 Colo. 428. This case is often cited to both of the propositions involved in the case at bar, namely, increase of total valua-

tions, and dealing with property by classes instead of deal-
ing with Counties as units.   In this case the Board of
Equalization of the State of Colorado has raised the ag-
gregate valuations of property in several of the Counties
and diminished such aggregate valuations in other Coun-
ties, and in some Counties they had made no change.   The
net increase of valuation was over $5,000,000.   The Con-
stitution under which the board acted provided "the duties
of the said Board of Equalization shall be to adjust and
equalize the valuation of real and personal property among
the several Counties of the State."   They also had the
constitutional provision that "all taxes shall be uniform
upon the same class of subjects within the territorial limit
of the authority levying the tax."   They had a statute
that the board was required to "examine the various as-
sessments as far as regards the State tax and equalize the
rate of assessments in the various Counties whenever they
are satisfied that the scale of valuation has not been ad-
justed with reasonable uniformity by the different asses-
sors."   The board was also required to ascertain whether
the "valuation of real estate in each County bears a fair
relation or proportion to the valuation of all other Coun-
ties in the State, and on such examination they may in-
crease or diminish the aggregate valuation of real estate
in any County as much as in their judgment may be nec-
essary to produce a just relation between all the valua-
tions of real estate in the State, but in no instance shall
they reduce the aggregate valuation of all the Counties
below the aggregate valuation as returned by the Clerks
of the several Counties."   The statute further provided
that "all taxable property shall be listed and valued each
year, and shall be assessed at its full cash value."

They had a constitutional provision in Colorado creat-
ing the office of County Assessor.   The decision of this
case is made to turn largely upon this last mentioned pro-
vision of the Constitution.   The Court says:   "The Con-
stitution provides (section 8, art. 14) for the election in
each County, each alternate year, of a County Assessor.
He is thus a constitutional officer, and, though his duties
are left unprescribed, the essential duties of an assessor

must be presumed to have been contemplated. Is there not here a plain intention on the part of the people to preserve local control over the valuation of property for purposes of taxation? This local control existed under the territorial form of government under which they had been living, and is this not an effort to secure it beyond contingency? In view of this provision and of other constitutional limitations, it may be gravely doubted whether it is competent for the legislative authority to take from County Assessors the substantial control of valuations of property for State taxation, and vest it in a central authority."

It thus clearly appears that the Colorado Court believed that all assessing power had been vested in the County Assessors by the Constitution of the State itself, and that therefore the State Board of Equalization could necessarily exercise no such power. The Court further says: "The Assessor is thus made an integral part of the revenue system which not only thus specifies and defines his duties, but assigns to other officers and boards equally well-defined and separate duties. The Assessor shall list and value. The board of commissioners shall equalize, adjust, increase and diminish, supply omissions, and correct errors, and hear complaints. The County Clerk shall prepare assessment rolls and compute and extend the tax therein. The State Board of Equalization shall adjust and equalize valuations, and, lastly, the County Treasurer shall collect the tax."

As before stated, this case is much relied upon throughout the western country. But we must say that in our opinion it is not authority for what it is often cited. The substance and effect of this case is that, by reason of the constitutional provisions of the State, it was not competent for the State legislature to confer the assessing power upon any other person or body than Assessors, as provided for in the Constitution, and that, in view of such constitutional provisions, the sections of the statute which were under consideration were given a more limited and restricted interpretation than they would have been given, had they been considered purely as a statute standing

alone.   The Court also founded its argument somewhat upon the fact that they had a limitation upon the rate of taxation in their Constitution in Colorado, and that, if the power to increase valuations existed in the state board, this limitation might be easily annulled.   The Court says: "Under this construction of the statute the efforts of the people to establish and maintain legitimate restraints on the power to tax will have been unavailing, and the checks and guards which they have embodied in their Constitution to that end cease to be of practical force or value. The spirit of the law and not 'the letter which destroys' must prevail.   We cannot believe that any such grant of power of the State Board of Equalization was within the intent of the legislative authority."   Just how the taxing power in the hands of the state board is more unsafe than in the hands of the Assessors is not pointed out, nor can we understand.

In People v. Ames, 27 Colo. 126, 60 Pac. 346, a new statute had been passed in 1899, which repealed previous legislation, and which provided that the State Board of Equalization should adjust and equalize the valuation of real and personal property among the several Counties of the State, and that it should have power to either increase or diminish the aggregate valuation of all taxable property not to exceed in any year 5 per cent. of such valuation, and only as an incident to such equalization.   The same constitutional provision existed as when the case of People v. Lothrop, supra, was decided.   The State Board of Equalization had increased and diminished the valuations of certain kinds and classes of property in Arapahoe County, varying from 2 to 54 per cent. in increase.   The Court adhered to its former decision, and emphasizes the importance of the constitutional provision in determining the powers of their State Board of Equalization.   The Court says:   "Each is a constitutional body, with powers defined and limited by the fundamental law of the State, the respective authority of which is essentially different. The former shall equalize and adjust the property values among the several Counties of the State; the latter shall equalize and adjust such values within the respective

Counties. The language employed with respect to the authority of each is different. That values should be equitably adjusted among the several Counties of the State was necessary, because, without a power lodged somewhere to effect this result, great inequality might prevail in the valuation of the different Counties, and the burden of supporting the State government would be inequitably distributed. For a like reason, it was necessary that property values be adjusted and equalized within the respective Counties, so that the taxes for County purposes would be uniform. The state board has no authority to revise the work of the county board. Therefore it has no power to equalize valuations between classes or kinds of property in the respective Counties, for that is a matter which the Constitution confides to the county board."

Thus it clearly appears that the Colorado decisions interpreting their statute are largely based upon the fact that the three taxing agencies, viz., Assessors, county boards, and state board, are all constitutional offices or bodies, and have granted to them certain specific powers which prevent the legislature from extending to the state board any part of the assessing power.

The constitutional provisions of Montana are copied from Colorado. Two cases from Montana are cited. State v. Board of Equalization, 18 Mont. 473, 480, 46 Pac. 266, and State v. Fortune, 24 Mont. 158, 60 Pac. 1086. The Montana Court follows the decision in Colorado, but in the latter case the Chief Justice concurred solely upon the ground of stare decisis and states that, if the question were an open one, he would favor a departure from the Colorado doctrine as demonstrably wrong.

In Wells Fargo & Co. v. State Board of Equalization, 56 Cal. 194, the state board had undertaken to pass upon individual assessments and to raise or lower the valuation thereof. The Constitution of California provided that the duty of the state board was "to equalize the valuation of the taxable property of the several Counties in the State for the purpose of taxation," and that the duty of the county boards was "to equalize the valuation of the taxable property in the County for the purposes of taxa-

tion." Those two provisions were followed by a proviso which was ambiguous in terms, for the reason that the power to raise or lower the entire assessment roll, or any assessment contained therein, was apparently given to both the County and the State boards. The Court construed the proviso distributively, reddendo singula singulis, giving to the county boards power to deal with individual assessments, and the state board power to deal with the rolls as a whole.

In Orr v. State Board of Equalization, 3 Idaho, (Hasb.) 190, 28 Pac. 416, the state board had increased the valuations by classes of property, and the action was challenged upon that ground. The statute in Idaho provided the manner of the exercise of the powers by the state board as follows: "(1) They shall add to the aggregate valuation of real and personal property in each County, which they believe to be valued below its proper valuation, such percentage in each case as will raise the same to its proper valuation." The Court held that the state board had no such power, because of the terms of the statute, which prescribed the mode of the exercise of the power. Other cases have been cited and relied upon by counsel, which we have examined, but we have found nothing in them to change our views, as heretofore expressed. We appreciate that little aid is to be obtained from the cases in the other States on account of the diversity of the statutory provisions. We think, however, that certain principles, fairly deducible from all of the authorities, are accepted in all of the cases, as follows:

The power of the state boards to equalize the burdens of taxation includes the power to deal with classes of property, unless, by reason of the terms of the taxing statute, or constitutional provisions, the power is restrained. Where the mode of the exercise of the power of equalization is pointed out in the statute, it must, of course, be followed. Where the mode is not pointed out, any reasonable and efficient mode may be adopted to accomplish the end in view. Unless controlled by statutory terms, the power to equalize includes the power to increase or decrease valuations, and such result is immaterial.

If we are correct in our deductions from the authorities, there would seem to be no difficulty in sustaining the action of the state board, in so far as they dealt with classes or property and increased total valuations in the State. Even if these deductions from the cases are not wholly warranted, we believe the considerations mentioned in the earlier part of this opinion amply justify our conclusions that under our statutes, and considering them as a whole, such action of the state board was justified.

The strongest argument, apparently, against the power of the state board, is the fact that no provision is made for notice to those affected by the action. Counsel do not **3** claim that this fact renders the action void as being an invasion of the constitutional rights of the taxpayer. But the fact that no such provision is made is suggested as strongly persuasive of the legislative intent not to confer the power which has been assumed by the state board. The argument, apparently strong, may be plainly and effectively answered. The statute fixing the time and place of meeting of the state board is itself notice to all taxpayers. Territory v. Bank, 10 N. M. 283, 65 Pac. 172, and cases cited. But this notice is notice only that the state board will meet and perform such acts as it may lawfully perform. It is notice to the taxpayer owning property of a certain class which has been grossly undervalued that the state board may raise the valuation of that class of property to its true valuation for taxation purposes. But it is no notice to the taxpayer whose property is already fully valued, and who has already passed the Assessor and county commissioners without harm, that the state board, by reason of its action, will impose upon him an overvaluation amounting to an illegal assessment. The notice of the statute is notice that the state board may do legal things but not illegal things. As is pointed out in Territory v. Bank, 10 N. M. 283, 65 Pac. 172, it is not contemplated that the taxpayer shall actually come to the State Capitol and attend the meetings of the state board, as the expense would be intolerable and absurd. This notice, while it is due process of law in the tax proceedings, is not intended to be actual notice. But it is sufficient no-

tice to all who are not wronged; it is no notice to those who are wronged by the imposition of an illegal tax. The taxpayer thus wronged has actual notice only after the action has been taken which inflicts the injury. The injury is not intentional on the part of the state board, but it is accidental as a result of a general order affecting all alike in some general class. The state board does not investigate the comparative valuations of the property of individuals in the same class, but compares classes of property with other classes. The relation, therefore, of the assessed valuations of the property of any given individual to the actual value of his property is not examined and passed upon by the state board. The taxpayer, then, must presume such remedies as the law provides.

We have a statute covering the matter as follows: "The assessment book, when delivered to the County collector of taxes, properly verified by the affidavit of the County Assessor, and properly certified by the county commissioners, as required by law, shall constitute his authority to collect the taxes therein set forth, and he shall not be held liable for any irregularity or illegality in any of the proceedings prior to his receiving said assessment book; and the amounts to be paid as taxes as shown by said assessment book, shall not be altered, reduced or in any manner changed, except by direction of the District or Supreme Court; but this prohibition shall not extend to the correction of obvious clerical errors in names, description of property, or computation of amount of taxes. If the collector shall discover any errors of other kinds in said assessment book by which any injustice would be done to any taxpayer, it shall be his duty to report the same to the District Attorney, and any taxpayer complaining of any such injustice may submit his complaint to the District Attorney; and if the District Attorney is satisfied that correction or change should be made so as to avoid injustice to the taxpayer, it shall be his duty to submit the matter to the District Court and ask for an order of that court that such change or correction should be made, without cost to the taxpayer injuriously affected." Chapter 84, par. 23, Laws 1913.

Ranch & Cattle Co. v. Board of Equalization, 18 N. M., 531.

It is to be noticed that the word "injustice" to the tax-payer is employed in this section. The word "injustice" would seem to be the broadest term which the legislature could have employed in this connection. Any case of over-valuation of the property of the taxpayer would seem clearly to be an injustice within the meaning of the act. It is to be further noticed that an injustice which is discovered after the tax rolls come into the hands of the collector is to be relieved against, under the terms of the section. Therefore, it would seem clear that the fact that the state board had increased the assesed valuation of property of any particular class would not deprive any taxpayer in that class from seeking the relief provided for. In other words, the action of the State Board of Equalization is not final as against the claims of any taxpayer in the State. The section requires the taxpayer to submit any claim of injustice to the District Attorney of the proper County, and if the District Attorney is satisfied that injustice has been done to the taxpayer, it is his duty to submit the matter to the District Court and ask for an order correcting the injustice without cost to the taxpayer. In this way relief is afforded to each individual taxpayer, without any cost or expense to him. If he can show that, by reason of the action taken by the state board, he is compelled to pay taxes upon more than one-third of the actual value of his property, it is to be assumed that the District Attorney will promptly present the matter to the District Court and secure the relief to which the taxpayer is entitled. It is true that the section provides that the District Attorney must be satisfied of the injustice before he will be required to make application to the District Court. This provision may make the District Attorney one of the taxing officers of the State, and there seems to be no appeal from his refusal to present the complaint of the taxpayer to the District Court. It does not follow, however, that his judgment upon the matter is necessarily final. To tax the citizen on more than one-third of the actual value of his property is illegal, under the taxing laws of this State. If it is illegal, and the taxpayer resorts to all the means provided by law to correct the injustice, it

would seem that the courts necessarily still remain open to him for redress. The taxpayer who has been wronged by overvaluation of his property, and who has had no notice of the action which results in injury, and who has applied to the District Attorney for relief without avail, certainly has the right to relief in the courts. If the taxpayer presents to the District Attorney substantial evidence of the injustice complained of, and the District Attorney refuses to act, his arbitrary refusal to submit the matter to the court would amount to legal fraud. This would bring the taxpayer clearly within the right to equitable relief against the excessive portion of the tax. 37 Cyc. 1263; 2 Cooley on Taxation (3rd ed.) 1459; Merrill v. Humphrey, 24 Mich. 170; County of Cochise v. Copper Queen, etc., Co., 8 Ariz. 221, 71 Pac. 946; Gove v. Tacoma, 26 Wash. 474, 67 Pac. 261.

Judge Cooley, in discussing this question, says: "A tax founded on a fraudulent assessment will be enjoined. An assessment is not fraudulent merely because of being excessive, if the assessors have not acted from improper motives; but if it is purposely made too high through prejudice or reckless disregard to duty in opposition to what must necessarily be the judgment of all competent persons, or through the adoption of a rule which is designed to operate unequally upon a class and to violate the constitutional rule of uniformity, the case is a plain one for the equitable remedy of injunction."

It is not our purpose to discuss critically or in detail in this case the remedies of taxpayers against unequal or excessive assessments, because the question is not involved and cannot be decided. What has been said is for the purpose of demonstrating that the argument offered against the action of the state board is not well founded.

Counsel for petitioners argue further that ever since the decision of Poe v. Howell, supra, neither the Territorial Board of Equalization nor the state board has assumed to exercise power of equalization by classes of property, nor to increase total valuation, until the action of the present state board was had. A sufficient answer to the argument may be pointed out in the fact that the legislation, as we

Ranch & Cattle Co. v. Board of Equalization, 18 N. M., 531.

have before seen, under which the present state board took its action, is entirely different in terms and effect from that heretofore existing. It does not follow that even assuming Poe v. Howell to have been properly decided under the statute then existing, the state board has not now the authority exercised under the present legislation.

Counsel further argue that at the time of the decision of Poe v. Howell and Territory v. Bank, supra, county boards had no power to fix valuations by classes, and that now, under the present legislation, they have such power. Therefore it is argued, even if Territory v. Bank were correctly decided, that now, under the present legislation, the county commissioners having the power expressly granted to them, the power in their hands is exclusive as against the state board.

A comparison of the two sections of the statute upon which argument is founded, and which heretofore have been set out, shows clearly that the argument is unsound. It is true. that county boards are required to fix valuations by classes. But it is likewise true that the state board are authorized and required to examine these valuations as they appear upon the assessment rolls, and to adjust and equalize the valuations therein shown, so that the valuation of property for purposes of taxation shall be of substantial uniformity throughout the State. This power to adjust and equalize these valuations necessarily includes, we think, the power to deal with the valuations as they appear in classes on the tax rolls.

There remains, however, another proposition which involves one phase of the action taken by the state board, which would seem to be of doubtful authority. It appears that the board made certain exemptions of individuals from the effect of the various raises of valuations in the several Counties, upon one or more classes of property. For instance, in Santa Fe County, some 29 persons were exempted from the order of the board raising the valuatioon of city lots, in the city of Santa Fe.

In almost every County in the State certain named persons were exempted from the order raising the values on

stocks of merchandise, and in 12 of the Counties certain named persons were assessed by the board on stocks of merchandise at various amounts. In one of the Counties a large number of persons and corporations had returned various areas of land as grazing land at $1.80 per acre, and the state board made an order changing the classification of these lands from grazing lands to coal lands, and fixed the valuation thereof at $12 per acre. This action was clearly in the nature of original assessment of property.

The action of the state board in regard to the change in classification of property is not involved in this case. Nor do we understand how the petitioners in this case can question the action of the state board in any of the other particulars mentioned. They are not among the persons who were specifically raised in valuations or specifically added to the lists and thereby subjected to original assessment. All that was done by the state board, which affects petitioners, was the raising of valuations of classes of property of which they allege they are the owners. As before seen, we cannot assume in this proceeding that any of the property of the petitioners is assessed at more than its actual value divided by three. If this is so, no injustice has been done them. So long as the taxpayer is not assessed more than the law provides, and in the absence of some well-defined and established scheme of discrimination, or some fraudulent action, he has no cause of complaint, and the courts have no power to review the action of the various taxing agencies established by law. 37 Cyc. 1263; Cooley on Taxation (3rd ed.) 1459; Albuquerque Bank v. Perea, 5 N. M. 664, 25 Pac. 776; Bank v. Albright, 13 N. M. 514, 86 Pac. 548: First National Bank v. Albright, 208 U. S. 548, 28 Sup. Ct. 349, 52 L. Ed. 614.

As before stated, the action of the state board in making original assessments of individuals and exempting others from general orders affecting classes of property would seem to be questionable. The power to deal with individuals would seem to be conferred exclusively on the County taxing officers by the various provisions of the

statute, except in cases of direct appeal to the state board. But we cannot decide this question because it is not involved. We simply decide that petitioners are not in a position to raise the question.

There is no error in the action of the State Board of Equalization of which the petitioners can complain in this proceeding, and, for the reasons stated herein, the petition and writ of certiorari will be dismissed, and it is so ordered.

### SYLLABUS (BY THE COURT)

